**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| TIMOTHY FERGUSON, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 20-cv-4046 |
| | ) | |
| v. | ) | Judge Robert M. Dow, Jr. |
| | ) | |
| COOK COUNTY, ILLINOIS; THOMAS | ) | |
| DART; CITY OF CHICAGO; RICHARD | ) | |
| BEDNAREK; JOHN D. BARLOGA; | ) | |
| ABELARDO MERCADO; EDDIE ISHOO; | ) | |
| and D-BATS, INC., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

In his seventeen-count Complaint [1], Plaintiff Timothy Ferguson ("Plaintiff" or "Ferguson") brings suit against Defendants Cook County Illinois ("County"), Cook County Sheriff Thomas Dart ("Dart"), Chicago Police Department ("CPD") Sergeant Richard Bednarek ("Bednarek"), Cook County Police Sergeant John Barloga ("Barloga"), Cook County Police Officers Eddie Ishoo ("Ishoo") and Abelardo Mercado ("Mercado"), and D-BATS, Inc. ("D-BATS") for damages arising out of his detention on July 12, 2019. Currently before the Court are the County's motion to dismiss [21]; the City's motion to dismiss [28]; Bednarek and D-Bat's motion to dismiss [49]; Bednarek and D-Bat's motion to strike [50]; Dart, Barloga, Abelardo and Ishoo's motion to dismiss [58]; and all Defendants' motion to dismiss for want of prosecution [66]. Also before the Court is Plaintiff's response to the motion to dismiss for want of prosecution [72], which requests additional time to respond to the motions to dismiss.

For the following reasons, Defendants' motion to dismiss for want of prosecution [66] and Plaintiff's request for additional time to respond to the motions to dismiss [72] are both denied.

The Court has decided the motions to dismiss based on the briefs before it.  Plaintiff's counsel is advised that any further noncompliance with applicable rules and orders may result in sanctions up to and including dismissal of this action.  The County's motion to dismiss [21] is granted; the City's motion to dismiss [28] is granted in part and denied in part; Bednarek and D-Bat's motion to dismiss [49] is granted in part and denied in part; Bednarek and D-Bat's motion to strike [50] is denied; and Dart, Barloga, Abelardo and Ishoo's motion to dismiss [58] is granted in part and denied in part.  The following claims are dismissed in full: Counts I, III, IV, V, VII, VIII, XII, XIII, XVI, and XVII.  The following claims remain in the case against the following Defendants: Count II (Section 1983 False Imprisonment) against Bednarek only; Count VI (Section 1983 Conspiracy) against Bednarek only; Counts IX (Civil Conspiracy), X (Intentional Infliction of Emotional Distress), and XI (State Law False Imprisonment) against Bednarek, Mercado, Ishoo, and Barloga; and Count XIV (Indemnification) against the County only.  A joint status report is due by August 5, 2021.

## I.      Background

The following facts are drawn from the Complaint [1].  All well-pled facts are presumed to be true for purposes of ruling on Defendants' motions to dismiss.  See *White v. United Airlines, Inc.*, 987 F.3d 616, 620 (7th Cir. 2021).

Plaintiff is a resident of Cook County and the manager of a property located at 7038 West 72nd Street in Chicago (the "Property").  Plaintiff's father, Terry Ferguson ("Terry"), acts as trustee and personal representative for the individual who owns a life estate in the Property, Dirk Ferguson ("Dirk").[1]  Dirk is disabled and inherited his life estate in the Property upon the death of his mother, Ida Cardwell ("Cardwell").  In January 2019, Terry leased the Property to Shaun

---

[1] The Court refers to these individuals by their first names to avoid confusion between the various Fergusons involved in this action.

Halloran ("Halloran"), who paid rent to Terry and was residing at the Property at all times relevant to the Complaint.

Defendant Sergeant Bednarek is employed by CPD. On information and belief, Bednarek also owns and operates D-BATS, an Illinois private investigation corporation headquartered in Cook County. On May 9, 2019, Bednarek entered the Property and attempted to serve a "Five Day Notice," *i.e.*, an eviction notice, on Halloran's girlfriend, Rena ("Rena").[2] According to the Complaint, the incident was captured on video. Bednarek, openly carrying a firearm, attempted to force his way into the residence, while Rena attempted to prevent him from entering. When Rena stepped back from the door, Bednarek reached into the residence and dropped an eviction notice inside. Rena called 911 to report that an unknown man had "kicked in the front door" to the Property. [1] at 5. Bednarek remained at the Property until police officers responded to Rena's 911 call. Bednarek told the responding officers (falsely, according to the Complaint) that he was a process server; that the Property "was not supposed to be rented out"; and that Plaintiff "had rented the Property against the judge's orders." *Id*.

On July 12, 2019, Halloran's dog walker, Paul Shinstine ("Shinstine") arrived at the Property to walk Halloran's dog. As Shinstine was walking up the driveway to the residence, Bednarek pulled up in a black SUV and blocked Shinstine from exiting the driveway. Bednarek asked Shinstine if he was Halloran and Shinstine responded "no" and identified himself as Halloran's friend and dog walker. Shinstine asked Bednarek who he was, and Bednarek allegedly responded, "I'm the King of England. You're going to jail for trespassing." [1] at 6. Bednarek claimed to be a special process server employed by D-BATS. Shinstine called Plaintiff to tell him that there was "an unknown man at the Property who had pulled a gun on him." *Id*.

---

[2] The Complaint does not provide Rena's last name.

3

Plaintiff immediately went to the Property, where he was approached by Bednarek. According to the Complaint, Bednarek knew from the May 9, 2019 incident that Plaintiff "was the designated property manager" for the Property. [1] at 6. When Plaintiff arrived, Bednarek called the Cook County Sheriff's Department and reported (falsely, according to the Complaint) that "there's two guys trespassing" at the Property. *Id.* at 7. Bednarek described what Plaintiff was wearing. He then demanded that Plaintiff leave the Property. In response to Bednarek's call, Officer Mercado reported to the Property. "Bednarek identified himself to Mercado" as a CPD Sergeant and "grabbed [Plaintiff] and pinned his arms behind his back preventing [Plaintiff] from leaving." *Id.* "Bednarek then demanded that Mercado handcuff and arrest [Plaintiff] for trespassing." *Id.* Mercado immediately handcuffed Plaintiff and placed him in the back seat of his squad car. Plaintiff "remained handcuffed and detained in the rear of the squad car for the next two hours." *Id.*

While Plaintiff was in the squad car, Bednarek falsely advised Mercado that Plaintiff was not supposed to be on the Property and had refused to leave. Bednarek then approached Shinstine and demanded identification, threatening that he would go to jail if he did not comply. Shinstine provided his identification, which Bednarek retained for the next two hours. Bednarek also blocked Shinstine's car in the driveway, preventing Shinstine from leaving. Bednarek told Shinstine that he and Plaintiff would be going to jail if they did not get Halloran to come home to the Property and accept a five-day eviction notice.

Soon after, Officer Ishoo arrived on the scene. Ishoo informed Bednarek that Bednarek could not file a trespass complaint because he had no ownership interest in the Property. Bednarek allegedly acknowledged that he could not file a trespass complaint and said that he was "just trying to scare" Plaintiff. [1] at 8. Sheriff Barloga then arrived at the Property. After being "advised of

the circumstances, he also advised Bednarek that that he, Bednarek, could not file a complaint for trespass against Timothy" and that "a process server has no skin in the game, no right to the property." *Id*. Nonetheless, Bednarek "persisted in his demands that [Plaintiff] be charged with trespass to land but also admitted, 'I'm trying to squeeze, of course.'" *Id*.

While Plaintiff was detained in the back of Mercado's squad car, Bednarek repeatedly ordered him to call Halloran, which Plaintiff did. Bednarek also "repeatedly verbally assaulted, abused and berated [Plaintiff] and made derogatory comments to and about him." [1] at 9. Mercado and Ishoo told Plaintiff that he would be released from the Cook County Sheriff's Office in Maywood, Illinois after he was booked and processed for trespass to land. They also told him that they could obtain his release from custody if Halloran appeared on the scene to accept service of process. Mercado and Ishoo "creat[ed] sworn police reports containing materially false statements," namely, that Bednarek had "the ability to press charges for trespass." *Id*.

After multiple phone calls, Plaintiff reached Halloran and asked him to return to the Property. Halloran agreed. When he arrived, Bednarek demanded Halloran's phone number. Halloran refused. Bednarek told Halloran that he had "to be out in 5 days. I'll be back in 5 days to take your stuff out." [1] at 10. Nearly two hours after he was handcuffed and placed in Mercado's squad car, "Bednarek signed complaint refusals regarding the trespassing charge." *Id*. (The Court assumes that this means Bednarek decided not to press charges against Plaintiff.) Plaintiff was released and allowed to leave the scene.

According to the Complaint, Bednarek has "a long history of citizen complaints of misconduct registered against him with the City of Chicago," including at least thirty-two citizen complaints "and/or related investigations into his behavior, both on duty and off-duty." [1] at 12. The Complaint further alleges that Bednarek committed domestic violence against his wife—an

incident that, if CPD had followed its policies and procedures, should have led to Bednarek's discharge from CPD prior to the July 19, 2019 incident with Plaintiff. The Complaint concludes that "[t]his failure to separate Bednarek from CPD clearly disregards public safety and shows the unwritten policy and custom of special and preferential treatment, protections and cover-ups provided to police officers." *Id*. at 16. The alleged "effect of such a policy and custom is that officers, including … Bednarek, feel that they can act with impunity and without fear of reprimand or discipline." *Id*.

Counts I through IV of the Complaint are brought pursuant to 42 U.S.C. § 1983. Count I is a claim for violation of Plaintiff's Fourteenth Amendment right to due process. According to the Complaint, "all of the Defendants, while acting individually, jointly and in conspiracy, as well as under color of law and within the scope of their employment, deprived Plaintiff of his constitutional rights" by "deliberately and intentionally arrest[ing] and detain[ing] Plaintiff without lawful justification." [1] at 16-17. As a result of Defendants' actions, Plaintiff allegedly "suffered extensive injuries including, but not limited to, severe emotional, psychological and physical injuries and distress." *Id*. at 17. Count II is a Section 1983 false imprisonment claim brought against all Defendants. Count III, also brought under 1983, is for "coerced confession." Count IV alleges that Defendants violated his Sixth Amendment right to counsel.

Count V is a conspiracy claim brought under 42 U.S.C. § 1985(3), while Count VI is a conspiracy claim brought under 42 U.S.C. § 1983. The Complaint alleges that "Defendants reached an agreement amongst themselves to falsely arrest [Plaintiff] and [Shinstine] and hold them in custody as hostages until [Halloran] appeared to accept summons and complaint." [1] at 19. In Count VII, a Section 1983 claim for failure to intervene, the Complaint alleges that "during the constitutional violations described above, one or more of the Cook County Sheriff's Police

6

Defendants (and other as-yet-unknown Cook County Sheriff's Police Officers) stood by without intervening to prevent the aforestated misconduct." *Id*. at 20.

Plaintiff also brings state law claims against all Defendants for malicious prosecution (Count VIII); civil conspiracy (Count IX); intentional infliction of emotional distress (Count X); false imprisonment (Count XI); false police report (Count XII); *respondeat superior* (Count XIII); indemnification (Count XIV); unreasonable detention (Count XV); unlawful detention (Count XVI); and kidnapping (Count XVII).

## II. Motion to Dismiss for Lack of Prosecution [66] and Plaintiff's Response [72]

Defendants all move to dismiss this action for lack of prosecution due to Plaintiff's failure to respond to their motions to dismiss by the deadline set by the Court. See [53]. To date, Plaintiff has filed no response to any of the motions to dismiss. Instead, on April 13, 2021, Plaintiff's counsel Beau Brindley filed a response to the motion to dismiss for want of prosecution [72], asserting that before responding to the motions to dismiss he needed to resolve a potential conflict of interest between his representation of Plaintiff in this case and his representation of Plaintiff's father, Terry, in a criminal matter. Plaintiff's counsel asserted that, "[e]thically, [he] needed to evaluate and resolve these conflict issues before filing any further substantive briefing on behalf of Plaintiff." *Id*. at 2. While Plaintiff's counsel allegedly "intended to request an extension of time to respond to the motions to dismiss in order to resolve these issues," he "inadvertently" failed to do so "[i]n the midst of COVID-19 limitations and a lack of staff in the office on a regular basis." *Id*. According to Plaintiff's counsel, his concerns about ethical conflicts were resolved by March 12, 2021, when Terry entered a guilty plea in his criminal matter. Plaintiff's counsel maintains that his failure to respond to the motions to dismiss or move for an extension of time did not prejudice Defendants "[g]iven the COVID-19 limitations on court proceedings during the time

between January 4, 2021 and the present." *Id*. at 3. Plaintiff's counsel requested "leave to file a response to the motions to dismiss for failure to state a claim within 30 days," *id.*, but to date has not filed any response.

The Court will not dismiss the action for lack of prosecution, but instead will resolve Defendants' motions to dismiss based on the briefs that have been filed. Rule 6(b)(1)(B) provides that the Court "may, for good cause, extend the time [to respond] on motion made after the time has expired if the party failed to act because of excusable neglect." Fed. R. Civ. P. 6(b)(1)(B). The Seventh Circuit has instructed that, "[t]o find 'excusable neglect,' courts should consider all relevant circumstances surrounding the party's neglect, including the prejudice to the non-movant, length of delay, and reason for delay." *Bowman v. Korte*, 962 F.3d 995, 998 (7th Cir. 2020).

In this case, Plaintiff's counsel fails to provide any reason, other than plain neglect, for failing to file a motion for extension of time to respond to the motions to dismiss before the deadline passed. Such "plain neglect is not 'excusable neglect' as Rule 6(b)(1)(B) requires." *Bowman*, 962 F.3d at 998 (citing *Nestorovic v. Metro. Water Reclamation Dist. of Greater Chi*., 926 F.3d 427, 431–32 (7th Cir. 2019)). Plaintiff's responses to the motions to dismiss were due January 4, 2021. See [53]. Plaintiff did not file either his responses or a motion for extension of time to respond by the deadline. By January 25, 2021, all Defendants had filed reply briefs in support of their motions to dismiss. Assuming Plaintiff's counsel inadvertently failed to move for an extension, Defendants' filing of their reply briefs should have alerted him of his failure to do so. Plaintiff's counsel would have received multiple notices from ECF, yet took no action to correct his error. Two months later, on March 26, 2021, Defendants moved to dismiss for lack of prosecution. See [66]. That motion was heard on April 6, 2021. Mr. Brindley did not appear, but instead had one of his colleagues appear on his behalf. See [69]. The Court gave Plaintiff until

April 16 to "file a response to the motion addressing (a) any reasons why dismissal for want of prosecution should not be entered and (b) any request that counsel may wish to make for leave to file response briefs more than three months late." *Id.*

Plaintiff's counsel filed that response on time, see [72], but it does not contain any information that convinces the Court that the failure to respond to the motions to dismiss, or to timely seek an extension, was excusable. As Plaintiff's counsel acknowledges, the potential conflict of interest did not prevent him from seeking an extension of time; that is a routine motion, not "substantive briefing." *Id.* at 2. In addition, the potential conflict was fully resolved by March 12, 2021—several weeks before Defendants filed their motion to dismiss for lack of prosecution. Yet Plaintiff's counsel took no action within that time to seek an extension or file response briefs. The COVID-19 pandemic does not provide a valid justification for ignoring the Court's deadlines, either. The Court never closed, and Plaintiff's counsel had nearly nine months (from mid-March 2020 to January 2021) to get his office operations in order so as not to miss important deadlines. And apparently Plaintiff's counsel has been able to operate to some extent, as well as take on new clients, since he filed this lawsuit in July 2020 in the midst of the pandemic. Further, although "[l]ack of prejudice" to the opposing party "is often used as a reason to excuse neglect," "even if we assume that [Defendants] suffered no prejudice," it does not suffice to excuse neglect where, as here, "the excuse is so threadbare as to make the neglect inexplicable.'" *Bowman*, 962 F.3d at 998 (quoting *United States v. McLaughlin*, 470 F.3d 698, 700–01 (7th Cir. 2006)). For these reasons, the Court concludes that Plaintiff is not entitled to file responses to the motions to dismiss months late. While the Court could dismiss the entire case for want of prosecution, it will take the middle course and instead decide the motions to dismiss based on the briefs before it.

## III.     Motions to Dismiss

### A.     Legal Standard

Federal Rule of Civil Procedure 8(a)(2) provides that, to state a claim for relief, a complaint "must contain … a short and plain statement of the claim showing that the pleader is entitled to relief." "The questions under [this rule] are whether the defendant has fair notice of what he must defend himself against and whether there is some reason to believe he could be found liable at the end of the case." *Williams v. Dart*, 967 F.3d 625, 638 (7th Cir. 2020). To survive a motion to dismiss under Rule 12(b)(6), a plaintiff must allege facts which, when taken as true, "'plausibly suggest that the plaintiff has a right to relief, raising that possibility above a speculative level.'" *Cochran v. Illinois State Toll Highway Auth.*, 828 F.3d 597, 599 (7th Cir. 2016) (quoting *EEOC v. Concentra Health Servs.*, 496 F.3d 773, 776 (7th Cir. 2007)). For purposes of a motion to dismiss under Rule 12(b)(6), the Court "'accept[s] as true all of the well-pleaded facts in the complaint and draw[s] all reasonable inferences in favor of the plaintiff.'" *Calderon-Ramirez v. McCament*, 877 F.3d 272, 275 (7th Cir. 2018) (quoting *Kubiak v. City of Chicago*, 810 F.3d 476, 480-81 (7th Cir. 2016)). However, this "tenet … is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678, which "can [be] reject[ed] at the motion to dismiss stage." *Dix v. Edleman Financial Services, LLC*, 978 F.3d 507, 514 (7th Cir. 2020).

The Court reads the complaint and assesses its plausibility as a whole. See *Atkins v. City of Chicago*, 631 F.3d 823, 832 (7th Cir. 2011). The Court may also consider "documents that are attached to the complaint, documents that are central to the complaint and are referred to in it, and information that is properly subject to judicial notice." *O'Brien v. Village of Lincolnshire*, 955 F.3d 616, 621 (7th 2020). In opposing a Rule 12(b)(6) motion, a plaintiff is "free to 'elaborate on his factual allegations so long as the new elaborations are consistent with the pleadings.'" *Peterson*

10

*v. Wexford Health Sources, Inc.*, 986 F.3d 746, 753 n.2 (7th Cir. 2021) (quoting *Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012)).

### B. Federal Claims

#### 1. Section 1985(3) Conspiracy Claim

In his Section 1985(3) conspiracy claim (Count V), Plaintiff alleges that "each of the Defendants conspired, directly or indirectly, for the purpose of depriving Plaintiff of his constitutional rights" and "took actions in furtherance of this conspiracy, causing injury to Plaintiff."  [1] at 18-19.  "Section 1985(3) prohibits a conspiracy to deprive another of equal protection under the law[,] but the conspiracy must be motivated by racial, or other class-based discriminatory animus."  *Smith v. Gomez*, 550 F.3d 613, 617 (7th Cir. 2008) (citing *Griffin v. Breckenridge*, 403 U.S. 88, 102, (1971); *Green v. Benden*, 281 F.3d 661, 665 (7th Cir. 2002)); see also *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 268 (1993); *Hernandez v. Partners Warehouse Supplier Services, LLC*, 890 F. Supp. 2d 951, 959 (N.D. Ill. 2012).  Nothing in the Complaint suggests that Defendants' treatment of Plaintiff was due to his race (which is not specified) or membership in any other identifiable class.  Therefore, Count V must be dismissed in its entirety.  See, e.g., *Payton v. Rush-Presbyterian-St. Luke's Medical Center*, 184 F.3d 623, 632 (7th Cir. 1999) (affirming dismissal of Section 1985(3) conspiracy claim where "the plaintiff has failed to allege that there was some racially (or otherwise discriminatorily) motivated animus behind the defendants' actions"); *Majeske v. Fraternal Order of Police*, 94 F.3d 307, 311 (7th Cir. 1996) (affirming dismissal of Section 1985(3) conspiracy claim brought against city and police union where the complaint "f[ell] short of an allegation that the [union] acted with the intent to deprive white officers of equal protection").

### 2. Section 1983 Claims

#### a. The County and Sheriff Dart

The Court now turns to the Section 1983 claims against the County and Sheriff Dart, which are all deficient for the same reason: they fail to identify any plausible basis for holding the County or Dart liable for the County police officers' alleged violations of Plaintiff's constitutional rights.

"Municipalities do not face *respondeat superior* liability under section 1983 for the misdeeds of employees or other agents. Only actions of the entity will suffice." *Flores v. City of South Bend*, 997 F.3d 725, 731 (7th Cir. 2021); see also *Monell v. Dep't of Social Services of City of New York*, 436 U.S. 658, 691 (1978). "Accordingly, to prevail on a § 1983 claim against a municipality under *Monell*, a plaintiff must challenge conduct that is properly attributable to the municipality itself." *First Midwest Bank Guardian of Estate of LaPorta v. City of Chicago*, 988 F.3d 978, 986 (7th Cir. 2021) (citing *Board of County Comm'rs v. Brown*, 520 U.S. 397, 403–04 (1997)). The Seventh Circuit has "interpreted this language to include three types of actions that can support municipal liability under § 1983: '(1) an express policy that causes a constitutional deprivation when enforced; (2) a widespread practice that is so permanent and well-settled that it constitutes a custom or practice; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority.'" *Id.* (quoting *Spiegel v. McClintic*, 916 F.3d 611, 617 (7th Cir. 2019)). Although *Monell* claims are not subject to a heightened pleading standard, see *Latuszkin v. City of Chi.*, 250 F.3d 502, 504 (7th Cir. 2001), *Baskins v. Gilmore*, 2018 WL 4699847, at *3 (N.D. Ill. Sept. 30, 2018), they must be based on "some specific facts" and "cannot simply rely on legal conclusions and conclusory allegations," *id.* (quoting *McCauley v. City of Chi.*, 671 F.3d 611, 616 (7th Cir. 2011)) (internal quotation marks omitted).

Similarly, "Section 1983 'does not allow actions against individuals merely for their supervisory role of others.'" *Doe v. Purdue University*, 928 F.3d 652, 664 (7th Cir. 2019) (quoting *Zimmerman v. Tribble*, 226 F.3d 568, 574 (7th Cir. 2000)). Rather, "[t]o be liable, a supervisor 'must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye.'" *Id.* (quoting *Zentmyer v. Kendall County*, 220 F.3d 805, 812 (7th Cir. 2000)).

The Complaint fails to state a Section 1983 claim against the County because it does not identify any express policies or widespread practices of the County that allegedly caused its employees to violate Plaintiff's constitutional rights. Nor does it allege that Plaintiff's constitutional injury was caused by a person with final policymaking authority for the County. The Complaint also fails to state a Section 1983 claim against Sheriff Dart. Its only mention of Dart is that he is "the elected Sheriff of Cook County, Illinois, who employs" Barloga, Ishoo, and Mercado. [1] at 2. The Complaint does not suggest that Dart knew about his officers' conduct, let alone facilitated, approved, condoned, or turned a blind eye to it. Therefore, all Section 1983 claims against the County and Sheriff Dart must be dismissed.

### b. D-BATS

Like public municipal corporations, private entities like D-BATS cannot be sued under Section 1983 solely on the basis of *respondeat superior*. See *Rodriguez v. Plymouth Ambulance Service*, 577 F.3d 816, 822 (7th Cir. 2009). Instead, a plaintiff must demonstrate that his injury was caused by the policy or practice of the entity or by someone at the policy-making level who knew about the misconduct and encouraged or condoned it (as well as that the private entity should be considered a "state actor"). See *id.* The Complaint does not contain any allegations suggesting that Plaintiff's injury was caused by a policy or practice of D-BATS or by a D-BATS policymaker

encouraging or condoning the actions causing the injury. Therefore, the Section 1983 claims against D-BATs are dismissed.

### c. Mercado, Ishoo and Barloga

Mercado, Ishoo, and Barloga move to dismiss the federal claims on multiple bases, including that they are entitled to qualified immunity. These Defendants argue that they, "under the totality of the circumstances, viewed in a common-sense manner, possessed probable cause to believe a crime had been committed and that Plaintiff had committed it while Plaintiff was under their detention," and therefore are immune from suit under Section 1983. [58] at 11.

"Once a government official invokes qualified immunity in a section 1983 suit, the burden shifts to the plaintiff to defeat the defense by showing (1) that a trier of fact could conclude that the officer violated a federal right, and (2) that the unlawfulness of the conduct was clearly established at the time the officer acted." *Estate of Davis v. Ortiz*, 987 F.3d 635, 638–39 (7th Cir. 2021); see also *Cibulka v. City of Madison*, 992 F.3d 633, 640 (7th Cir. 2021); *Siddique v. Laliberte*, 972 F.3d 898, 902–03 (7th Cir. 2020). This is Plaintiff's "burden to overcome" "even at the pleading stage." *Sinn v. Lemmon*, 911 F.3d 412, 419 (7th Cir. 2018). Plaintiff can show that the law is clearly established "'either by identifying a closely analogous case or by persuading the court that the conduct is so egregious and unreasonable that, notwithstanding the lack of an analogous decision, no reasonable officer could have thought he was acting lawfully.'" *Id*. (quoting *Abbott v. Sangamon County*, 705 F.3d 706, 723–24 (7th Cir. 2013)).

Plaintiff, by failing to respond to the motion to dismiss, has failed to meet his burden as to either prong of the qualified immunity analysis. The Court will not "flip this well-established burden on its head," *Cibulka*, 992 F.3d at 640, merely because Plaintiff's counsel was inexcusably negligent in not filing a response brief. Therefore, all of the Section 1983 claims against Mercado,

14

Ishoo and Barloga are dismissed on the grounds of qualified immunity.  See *Sinn*, 911 F.3d at 419 (affirming dismissal of § 1983 claims on motion for judgment on the pleadings where plaintiff "made no attempt to respond to the qualified immunity point"; explaining that "simply pointing to his complaint's allegations was insufficient to meet this burden" and holding that plaintiff "may not relitigate this issue on appeal because he failed to respond to defendants' arguments on it before the district court").

### d.  Bednarek

#### i.  Absolute Immunity

Bednarek argues that he has absolute immunity from all of Plaintiff's Section 1983 claims because he is a process server who was "[a]cting on a facially valid court order" to serve a "five-day eviction notice" for D-BATS. [49] at 6-7.[3]  Bednarek attaches to his motion to dismiss a copy of the "Motion & Order in Special Process," which lists "Sean Halloran" as the Defendant and appoints "Dbats Inc." "to make service of process in this cause."  *Id*. at 24.

An "official seeking absolute immunity bears the burden of showing that such immunity is justified for the function in question.'"  *Heyde v. Pittenger*, 633 F.3d 512, 517 (7th Cir. 2011) (quoting *Burns v. Reed,* 500 U.S. 478, 486 (1991)).  The Seventh Circuit has advised that "absolute immunity is applied with caution and only when it is necessary to protect the function at issue." *Richman v. Sheahan*, 270 F.3d 430, 438 (7th Cir. 2001).  As a result, "[q]uasi-judicial immunity only extends to those acts specifically directed by a judge, and does not protect the manner in which an officer carries out a judge's directive."  *Falk v. Perez*, 973 F. Supp. 2d 850, 859 (N.D. Ill. 2013).

---

[3] Unlike the individual County Defendants, Bednarek does not assert a qualified immunity defense to Plaintiff's Section 1983 claims.

In this case, the order authorizing D-BATs to serve process on Halloran (or unknown occupants) does not purport to provide D-BATs or Bednarek with *carte blanche* to use any means necessary to get Halloran to accept service. It does not order or authorize Bednarek to threaten Plaintiff (who Bednarek allegedly knew was the Property manager) with arrest for trespass or to cause Plaintiff to be handcuffed and placed under arrest until he could convince Halloran to return to the property. These are "acts that the order did not specifically require" Bednarek to perform, and therefore are not entitled to the protection of quasi-judicial immunity, at least at the pleading stage of the case. *Cortez v. Close*, 101 F. Supp. 2d 1013, 1017 (N.D. Ill. 2000) (deputy sheriffs' actions in connection with service of notice of eviction, including searching premises, kicking in bedroom doors, placing gun to one resident's head and throwing him against wall, and handcuffing another resident without provocation or probable cause, were not "ministerial duties" which court order of possession authorized or required, and thus deputies were not entitled to quasi-judicial immunity in residents' § 1983 action arising from incident); see also *Richman*, 270 F.3d at 438 (sheriff's deputies executing a restraining order on son were not entitled to quasi-judicial immunity from mother's suit arising from deputies' restraint of son, which ended in his death, where deputies were "not being called upon to answer for wrongdoing directed by the judge, but instead for their own conduct"); *Falk*, 973 F. Supp. 2d at 858-59 (deputy "acted outside the scope" of order in evicting tenant of residence subject to foreclosure and was therefore not entitled to quasi-judicial immunity from tenant's § 1983 action, where order directed sheriff to act in the event possession was withheld, and in that instance, sheriff was directed to evict and dispossess only mortgagor, not tenant).

### ii.     Color of Law

Bednarek argues that all of Plaintiff's Section 1983 claims are subject to dismissal because he was off duty as a CPD sergeant, see [1] at 1-2, and not acting under color of law when he was alleged to have violated Plaintiff's constitutional rights.  "A law enforcement officer can be liable under § 1983 if the officer deprives the plaintiff of a federally guaranteed right while acting 'under color of state law.'" *Barnes v. City of Centralia*, 943 F.3d 826, 831 (7th Cir. 2019) (quoting *Wilson v. Price*, 624 F.3d 389, 392 (7th Cir. 2010)).  "[A]ction is taken under color of state law 'when it involves a misuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" *Wilson*, 624 F.3d at 392 (quoting *Honaker v. Smith,* 256 F.3d 477, 484–85 (7th Cir. 2001)).  "A state officer's conduct does not constitute acting under color of state law unless it is 'related in some way to the performance of the duties of the state office.'" *Id.* (quoting *Honaker,* 256 F.3d at 485).  "[W]hether or not a police officer is off-duty does not resolve the question of whether he or she acted under color of state law." *Byrne v. City of Chicago*, 447 F. Supp. 3d 707, 711 (N.D. Ill. 2019).

Bednarek and the City argue that "the facts pled do not permit a reasonable inference that Defendant Bednarek was acting under color of law," because "[t]he only related fact is that Defendant Bednarek told Deputy Sheriff Mercado that he was a CPD sergeant." [28] at 13.  They maintain that "Bednarek did not identify himself as a law enforcement officer to Plaintiff" or "threaten or force the deputy sheriffs to arrest Plaintiff based on his status as a CPD sergeant" and that the Complaint contains no "facts to support an inference that [Plaintiff's] detention happened because of Defendant Bednarek's employment as a CPD sergeant." *Id*.

This characterization of the Complaint does not draw all inferences in Plaintiff's favor, as the Court is required to do at the motion to dismiss stage.  According to the Complaint, Bednarek—

presumably in the presence of Plaintiff—identified himself to Mercado as a CPD Sergeant. [1] at

7. Bednarek then "grabbed [Plaintiff] and pinned his arms behind his back preventing [Plaintiff]

from leaving." *Id*. Bednarek "demanded that Mercado handcuff and arrest [Plaintiff] for

trespassing." *Id*. Mercado followed Bednarek's instruction, handcuffed Plaintiff, and placed him

in the back of his squad car, where he remained for approximately two hours. *Id*. Bednarek also

prevented Shinstine from leaving the Property by blocking his car in the driveway. He demanded

Shinstine's identification and threatened that he would go to jail if he did not comply. All of

Bednarek's actions are ones that could reasonably be interpreted as official acts taken on behalf of

CPD to enforce laws prohibiting trespassing. It is also a reasonable inference that the other officers

went along with Bednarek's instructions *because* he identified himself as a CPD officer and acted

as if he had authority to direct their actions, to use physical force against Plaintiff, and to detain

Shinstine. It is difficult to imagine the County officers going along with Bednarek's instructions

if Bednarek had *not* invoked his status as a CPD officer.

Given all of the surrounding circumstances alleged in the Complaint, the fact that Bednarek

was off duty, see [1] at 1-2, does not preclude a finding that he was acting under color of state law

during the incident alleged in the Complaint. See, e.g., *Pickrel v. City of Springfield*, 45 F.3d 1115,

1118-19 (7th Cir. 1995) (fact that police officer was off duty while working as private security

guard for restaurant did not preclude finding that officer was acting "under color of state law"

when he got in an altercation with a restaurant patron, where patron alleged that officer was

wearing his police uniform and displayed his badge, that he was wearing a gun, that his marked

squad car was parked just outside, and that he charged patron with, among other things, resisting

peace officer); *Pineda v. Jorge Arteaga Corp.*, 2009 WL 1137754, at *3 (N.D. Ill. Apr. 23, 2009)

(alleged victim of battery at the hands of two off-duty correctional facility officers sufficiently

stated a § 1983 excessive force claim after officers threw him out of a restaurant, where the complaint alleged that the officers were wearing shirts that said "police" on them; the fact that the officers "were also acting within their authority as bouncers for a private establishment does not preclude the conclusion that they were also acting under the color of the law").

### iii.  Count I – Violation of Fourteenth Amendment Right to Due Process

In Count I of the Complaint, Plaintiff alleges that Defendants violated his right to due process when they "deliberately and intentionally arrested and detained Plaintiff without lawful justification." [1] at 17. The Court dismisses this claim because (a) "[t]he injury of wrongful pretrial detention may be remedied under § 1983 as a violation of the Fourth Amendment, not the Due Process Clause," *Lewis v. City of Chicago*, 914 F.3d 472, 479 (7th 2019); and (b) the Complaint already contains a Section 1983 claim for "false imprisonment" (Count II), which the Court construes as a claim for violation of the Fourth Amendment.

### iv.  Count II – False Imprisonment

Count II is a Section 1983 false imprisonment claim brought against all Defendants. "False imprisonment, for purposes of a § 1983 claim, is defined as detention without legal process." *Brown v. Dart*, 876 F.3d 939, 941 (7th Cir. 2017) (citing *Wallace v. Kato*, 549 U.S. 384 (2007)). "To state such a claim, Plaintiff must allege that he was arrested or seized without probable cause." *Glickman v. Main-Niles Ass'n of Special Recreation*, 440 F. Supp. 3d 946, 958 (N.D. Ill. 2020); cf. *Neita v. City of Chicago*, 830 F.3d 494, 497 (7th Cir. 2016) (false arrest).

Bednarek argues that this claim must be dismissed because the facts alleged in the Complaint "show[] that the detention of Plaintiff was reasonable." [49] at 13. According to Bednarek, his "'mere act of giving information to the police is insufficient to constitute participation in an arrest'" and the County officers properly "detained Plaintiff to investigate the

matter.'" *Id.* (quoting *Dutton v. Roo-Mac, Inc.*, 426 N.E. 2d 604, 607 (Ill. App. 1981); citing *Odorizzi v. A.O. Smith Corp.*, 452 F. 2d 229, 231 (7th Cir. 1971)).

Bednarek's argument ignores critical factual allegations and mischaracterizes the case law. According to the Complaint, Bednarek knew at the time that he called the County officers that Plaintiff "was the designated property manager … at the Property. [1] at 6. This allegation supports the inference that Bednarek knew that Plaintiff was not a trespasser but reported him anyway to induce him to convince Halloran to return to the Property and accept the eviction notice. Further, Bednarek did not "mere[ly] giv[e] information" to the police. [49] at 13. Bednarek allegedly dialed the Cook County Sheriff's Police, described what Plaintiff and Shinstine were wearing, and said "there's two guys trespassing" at the Property. [1] at 7. When Mercado arrived, Bednarek "demanded that Mercado handcuff and arrest [Plaintiff] for trespassing." *Id.* After Plaintiff was placed in Mercado's squad car, "Bednarek falsely advised Mercado that [Plaintiff] was not supposed to be on the Property and that he, Bednarek, advised [Plaintiff] to leave and that [Plaintiff] refused." *Id.* Thus, according to the Complaint, the County officers were not detaining Plaintiff to investigate the matter further; they detained him at Bednarek's direction and demand. The Complaint does not allege any facts suggesting that the officers performed any investigation while Plaintiff was in Mercado's squad car.

These allegations are sufficient to state a false imprisonment claim. The Seventh Circuit has recognized that "[a] police officer who files a false report may be liable for false arrest if the filing of the report leads to a seizure in violation of the Fourth Amendment, even if he did not conduct the arrest himself." *Acevedo v. Canterbury*, 457 F.3d 721, 723 (7th Cir. 2006). The same has been held true of private citizens who knowingly provide false information to the arresting officers. *Glickman*, 440 F. Supp. 3d at 958-59 (arrestee pled plausible § 1983 false arrest claim

against municipal employees by alleging that they made specific false and defamatory statements to police officers, which led officers to arrest him, and that they signed criminal complaint charging him with disorderly conduct); *Stokes v. Board of Educ. of the City of Chicago*, 599 F.3d 617, 624 n.2 (7th Cir. 2010) (where police gave school principal the authority to sign a criminal complaint, he could be liable for false arrest if he lacked probable cause to allege the criminal acts detailed in the complaint).

### v.      Count III – Coerced Confession

Count III, also brought under Section 1983, is for "coerced confession."  It alleges that, "[a]s more fully described above, one or more of the Defendants used unjustified and illegal threats and violence against Plaintiff in an attempt to coerce him to confess to a crime he did not commit." [1] at 18.  "A person abused by police during an interrogation has a Fourth Amendment claim for coercive interrogation, regardless whether any evidence obtained from the interrogation is later used at trial." *Wrice v. Byrne*, 488 F. Supp. 3d 646, 675 (N.D. Ill. 2020).  However, the Complaint does not allege any facts suggesting either that Plaintiff was interrogated or that any individual Defendant "attempt[ed] to coerce him to confess to a crime he did not commit." [1] at 18.  Instead, the Complaint alleges that when Plaintiff was detained in the back of Mercado's squad car, "Bednarek repeatedly ordered him to call Shaun Halloran," *id*. at 8, and "repeatedly verbally assaulted, abused and berated [him] and made derogatory comments to and about him." *Id*. at 9. The Court fails to see how these allegations support a claim for coercive interrogation, especially as Defendant has never provided any further explanation for the basis of his claim.  Count III is therefore dismissed.

### vi.     Count IV – Sixth Amendment Right to Counsel

Count IV alleges that Defendants "denied Plaintiff, Timothy, his right to counsel in violation of his constitutional rights." [1] at 18. "It is well-established that the Sixth Amendment right of an accused person 'to have the Assistance of Counsel for his defence,' U.S. CONST. amend. VI, attaches at 'the initiation of adversary judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment.'" *Thompkins v. Pfister*, 698 F.3d 976, 984 (7th Cir. 2012) (quoting *Kirby v. Illinois*, 406 U.S. 682, 689 (1972)).[4] Thus, "[u]ntil the time of a formal charge, indictment, information or arraignment, a suspect does not have a right to counsel under the Sixth Amendment." *Yachnin v. Village of Libertyville*, 803 F. Supp. 2d 844, 851 (N.D. Ill. 2011). The Complaint in this case does not allege any facts suggesting that Plaintiff was ever charged, indicted, or arraigned for trespass. Rather, Bednarek declined to sign a criminal complaint against Plaintiff. Therefore, Plaintiff's Sixth Amendment right was never implicated and Count IV must be dismissed. See, e.g., *Watson v. Hulick*, 481 F.3d 537, 542 (7th Cir. 2007) (defendant's Sixth Amendment right to counsel had not yet attached at the time he confessed to murder while in police custody following his arrest; although assistant state's attorney had interviewed defendant at the police station, defendant had not been indicted and charges had not been brought against him when he confessed).

### vii.    Count VI – Conspiracy, 42 U.S.C. § 1983

Count VI is a conspiracy claim brought under 42 U.S.C. § 1983. The Complaint alleges that "Defendants reached an agreement amongst themselves to falsely arrest [Plaintiff] and

---

[4] By contrast, the Fifth Amendment privilege against self-incrimination "protects an individual from 'answer[ing] official questions put to him in any ... proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings.'" *Chicago Title Insurance Co. v. Sinikovic*, 125 F. Supp. 3d 769, 776 (N.D. Ill. 2015) (quoting *Lefkowitz v. Turley*, 414 U.S. 70, 76 (1973)).

[Shinstine] and hold them in custody as hostages until [Halloran] appeared to accept summons and complaint." [1] at 19.

"To establish conspiracy liability in a § 1983 claim, the plaintiff must [allege] that (1) the individuals reached an agreement to deprive him of his constitutional rights, and (2) overt acts in furtherance actually deprived him of those rights." *Beaman v. Freesmeyer*, 776 F.3d 500, 510 (7th Cir. 2015); see also *Sánchez v. Village of Wheeling*, 447 F. Supp. 3d 693, 705 (N.D. Ill. 2020). "Because conspiracies are often carried out clandestinely and direct evidence is rarely available, plaintiffs can use circumstantial evidence to establish a conspiracy, but such evidence cannot be speculative." *Beaman*, 776 F.3d at 511. "There is no heightened pleading standard for conspiracy claims: '[I]t is enough in pleading a conspiracy merely to indicate the parties, general purpose, and approximate date, so that the defendant has notice of what he is charged with.'" *Sánchez*, 447 F. Supp. 3d at 705 (quoting *Walker v. Thompson*, 288 F.3d 1005, 1007 (7th Cir. 2002)).

Here, the Complaint identifies the parties to the conspiracy: Bednarek, Mercado, Ishoo, and Barloga. It also identifies the general purpose of the conspiracy, which was to hold Plaintiff and Shinstine in custody until Halloran appeared to accept the eviction notice, even though all of the individual Defendants allegedly knew that there was no probable cause for charging Plaintiff with trespass because Bednarek, as a process server, had no ownership interest in the Property and no ability to sign a complaint for trespass.

Bednarek maintains that the Complaint fails to allege a Section 1983 conspiracy because "Plaintiff does not allege any conversation or communication between Defendants and the Cook Count Sherriff deputies indicative of a conspiracy." [49] at 16. This is not accurate. The Complaint alleges that when Ishoo advised Bednarek that he could not file a trespass complaint because he had no ownership interest in the Property, Bednarek admitted that he knew this and he

was "just trying to scare" Plaintiff. [1] at 8. Soon after, Bednarek had a similar conversation with Barloga, admitting that "I'm trying to squeeze, of course'" and persisting in his demand that Plaintiff be charged with trespass. *Id*. According to the Complaint, all of the officers went along with Bednarek's plan of holding Plaintiff hostage until he was able to convince Halloran to return to the Property, even though they had no basis for believing that Plaintiff was trespassing. The County officers also allegedly stood by while Bednarek "repeatedly verbally assaulted, abused and berated [Plaintiff] and made derogatory comments to and about him." *Id*. at 9. Further, Mercado and Ishoo allegedly told Plaintiff that he would be released from the Cook County Sheriff's Office in Maywood, Illinois after he was booked and processed for trespass to land—despite all the officers allegedly knowing that Bednarek could not sign a criminal complaint for trespass. Once Halloran finally appeared, the officers dropped the pretense that they had a basis to charge Plaintiff with trespass; Bednarek refused to sign the criminal complaint and Plaintiff and Shinstine were released.

Finally, Bednarek claims that "Defendants went to the subject Property to serve a five-day notice of eviction; a five-day notice for any occupants to vacate the Property because they had no right to possess it or be on the premises." [49] at 17. "In other words," Bednarek argues, "persons other than the rightful owner that obtained the five-day notice issued by the Court were trespassing." *Id*. However, that is not what the eviction notice says. Rather, Halloran and any other unknown occupants of the Property had to be given five days to vacate the premises. Taken together, the Complaint's "allegations give sufficient notice of the contours of the conspiracy

24

claim, and no greater specificity is required to survive a motion to dismiss." *Sánchez*, 447 F. Supp. 3d at 705.[5]

### e.  The City – *Monell* Liability

Although the Complaint does not allege a *Monell* claim against the City in a separate count or identify *Monell* by name, the Court presumes that Plaintiff intends to bring his Section 1983 claims against the City based on the *Monell* theory of municipal liability.  As noted above, there are "three types of actions that can support municipal liability under § 1983: '(1) an express policy that causes a constitutional deprivation when enforced; (2) a widespread practice that is so permanent and well-settled that it constitutes a custom or practice; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority.'" *First Midwest Bank*, 988 F.3d at 986 (quoting *Spiegel*, 916 F.3d at 617); see also *Thomas v. Martija*, 991 F.3d 763, 773–74 (7th Cir. 2021).

The City moves to dismiss the *Monell* claim on several grounds.  First, the City asserts that there is no underlying constitutional violation to support a *Monell* claim, because Bednarek was not acting under color of state law during the July 12, 2019 incident.  However, whether Bednarek was acting under color of state law cannot be resolved on a motion to dismiss, for the reasons explained above.  Further, Plaintiff has adequately pled an underlying constitutional violation: Bednarek's alleged false imprisonment of Plaintiff in violation of the Fourth Amendment and Section 1983.[6]

---

[5] The Court presumes that Plaintiff intended to bring his Section 1983 failure to intervene claim (Count VII) against the County officers only.  Since they are entitled to qualified immunity for the reasons explained above, the Court finds it unnecessary to discuss Count VII, which will be dismissed in full.

[6] The Court assumes for purposes of this analysis that false imprisonment is the underlying constitutional violation, rather than Section 1983 conspiracy, because there are no allegations in the Complaint tying the alleged conspiracy between Bednarek and the County officers to a widespread practice of the City.

Second, the City claims that the Complaint "does not state what the alleged widespread practice (or de facto policy) is" or how it is the "moving force" behind Bednarek's alleged violations of Plaintiff's constitutional rights. [28] at 16. But the Complaint is fairly clear that it is premised on the theory that the City maintains a custom or practice of failing to investigate, discipline, and/or terminate officers who engage in misconduct, causing its officers, including Bednarek, to "feel that they can act with impunity and without fear of reprimand or discipline." [1] at 16; see also *id.* (alleging that CPD has an "unwritten policy and custom of special and preferential treatment, protections and cover-ups provided to police officers"). Courts in this district have denied motions to dismiss, motions for summary judgment, and motions to vacate jury verdicts which have been premised on a similar theory of *Monell* liability. See, e.g., *Spearman v. Elizondo*, 230 F. Supp. 3d 888, 894-95 (N.D. Ill. 2016) (plaintiff sufficiently alleged that city police department's "code of silence," and city's policy of refusing to discipline officers, was moving force behind her and her children's constitutional injuries arising from incident in which city police officer allegedly executed search warrant at wrong apartment, traumatizing plaintiff and her children in violation of Fourth Amendment; plaintiff alleged that code of silence gave officers comfort and a sense that they could violate citizens' rights and not be disciplined, and positively encouraged or emboldened the officers to carry out searches in reckless manner); *Sassak v. City of Park Ridge*, 431 F. Supp. 2d 810, 816 (N.D. Ill. 2006) ("A failure-to-train or –discipline allegation often supports a finding of municipal liability because a policy of condoning abuse may embolden a municipal employee and facilitate further abusive acts."); *Obrycka v. City of Chicago*, 913 F. Supp. 2d 598, 604 (N.D. Ill. 2012) (discussing jury's finding that a code of silence and/or policy of failing to discipline officers was the moving force behind off-duty officer's beating of plaintiff in violation of her substantive due process right to bodily integrity; refusing to vacate

verdict that "touched on the public interest of whether the City has a widespread custom or practice of failing to adequately investigate and/or discipline its officers and whether there is a police code of silence"); *Maglaya v. Kumiga*, 2015 WL 4624884, at *5 (N.D. Ill. Aug. 3, 2015) ("Plaintiffs' claims that the City refuses to discipline officers for engaging in misconduct and that police officers operate under a code of silence, in combination, allow for a plausible inference that these practices emboldened Defendant officers to illegally seize Plaintiffs' dog in violation of the Fourth Amendment.").

Third, the City argues that Plaintiff cannot maintain a *Monell* claim because he does not "identify any similar instances that plausibly suggest the existence of an alleged widespread practice." [28] at 16. According to the City, "courts in this district generally dismiss *Monell* claims in which '[a]ll of the allegations in the Complaint pertain exclusively to [the plaintiff].'" *Id.* (quoting *Elder v. Dart*, 2015 WL 509555, at *3 (N.D. Ill. Feb. 4, 2015)). However, this is not a blanket rule, and courts in this District to address the issue more recently have recognized that "a plaintiff raising a *Monell* claim may rely solely on his own experience, rather than being required to plead examples of other individuals' experiences," *Williams v. City of Chicago*, 315 F. Supp. 3d 1060, 1079 (N.D. Ill. 2018), as *Monell* claims are not subject to a heightened pleading standard. See *White v. City of Chicago*, 829 F.3d 837, 844 (7th Cir. 2016) (holding that plaintiff "was not required to identify every other or even one other individual who had been arrested pursuant to a warrant obtained through the complained-of process" (citing *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 164 (1993))); see also *Williams v. City of Chicago*, 2017 WL 3169065, at *9 (N.D. Ill. 2017) ("Post-*White* courts analyzing *Monell* claims similarly have 'scotched motions to dismiss' premised on arguments that the complaint does not contain allegations beyond those relating to the plaintiff." (quoting *Stokes v. Ewing*, 2017 WL

2224882, at *4 (N.D. Ill. May 22, 2017), and collecting cases)). Instead, "[i]n determining whether a plaintiff has sufficiently pled a widespread practice in a *Monell* claim, the Court looks to the instances of misconduct alleged, the circumstances surrounding the alleged constitutional injury, and additional facts probative of a widespread practice or custom." *Williams*, 315 F. Supp. 3d at 1079 (citing *Carmona v. City of Chicago*, 2018 WL 1468995, at *2 (N.D. Ill. Mar. 26, 2018)).

Here, the Complaint identifies enough specific examples involving Bednarek to suggest that the City's failure to discipline and terminate officers who engage in misconduct and have a large number of citizen complaints against them is a widespread custom and practice. In particular, the Complaint alleges that 1) Bednarek "has a long history of citizen complaints of misconduct registered against him with the City of Chicago," including at least 32 citizen complaints registered against him with CPD; 2) Bednarek has had "at least two verdicts entered against him in his official capacity as a police officer"; 3) Bednarek should have been, but was not, terminated from CPD in 2017 after the Civilian Office of Police Accountability ("COPA") determined that he had "engaged in conduct 'that could have resulted in his conviction' for the misdemeanor crime of domestic violence," *id.* at 16; and 4) CPD's Bureau of Internal Affairs "has yet to conduct and/or conclude its investigation of the July 12, 2019 incident" described in the Complaint, *id.* at 11. These allegations also suggest that City policymakers were "'aware of the risk created by the custom or practice and … failed to take appropriate steps' to address it." *Spearman*, 230 F. Supp. 3d at 894 (quoting *Thomas v. Cook County Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010)). For these reasons, the Court concludes that the Complaint plausibly alleges a *Monell* claim against the City.

This conclusion also informs the Court's decision to deny Bednarek's motion to strike the Complaint's allegations concerning the prior verdicts against him and his alleged acts of domestic violence. See [50]. That motion is premised on the argument that the allegations have no

relevance to the lawsuit and have been alleged simply to harass Bednarek and inflame prejudice against him.  While the Complaint arguably goes into more detail concerning the domestic abuse allegations than is necessary to make Plaintiff's point, all of the allegations are relevant to Plaintiff's theory that the City maintains a custom or practice of failing to investigate, discipline, and/or terminate officers who engage in misconduct, which causes its officers to "feel that they can act with impunity and without fear of reprimand or discipline."  [1] at 16.  Plaintiff therefore cannot show that "'that the allegations being challenged are so unrelated to plaintiff's claim as to be void of merit and unworthy of any consideration and that the allegations are unduly prejudicial,'" as required to support a motion to strike.  *VitalGo, Inc. v. Kreg Therapeutics, Inc.*, 370 F. Supp. 3d 873, 880 (N.D. Ill. 2019) (quoting *Cumis Insurance Society, Inc. v. Peters*, 983 F. Supp. 787, 798 (N.D. Ill. 1997)).

### C.   Illinois State Law Claims

#### 1.   Supplemental Jurisdiction

Bedarek and D-BATS assert that all of the state law claims against them must be dismissed because all of the federal claims are deficient, leaving only state law claims over which the Court may no longer exercise supplemental jurisdiction.  They further claim, based on *Finley v. United States*, 490 U.S. 545 (2005), that "pendent claim jurisdiction does not extend to pendent-party claims, which are characterized as an attempt by a plaintiff to pursue a State law claim in federal court against one defendant when the plaintiff has a federal claim against a separate defendant." [49] at 10.  However, 28 U.S.C. § 1367 "overturned the result in *Finley*."  *Exxon Mobil Corp. v. Allapattah Services, Inc.*, 545 U.S. 546, 558 (2005).  Section 1367(a) makes clear that, except in limited circumstances not applicable here, "in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims

that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution," including in particular "claims that involve the joinder or intervention of additional parties." 28 U.S.C. § 1367(a). As the Supreme Court summarized in *Exxon*: "Section 1367(a) is a broad grant of supplemental jurisdiction over other claims within the same case or controversy, as long as the action is one in which the district courts would have original jurisdiction. The last sentence of § 1367(a) makes it clear that the grant of supplemental jurisdiction extends to claims involving joinder or intervention of additional parties." *Exxon*, 545 U.S. at 558. The Court has determined that Plaintiff has viable Section 1983 claims against Bednarek; therefore the Court may also exercise supplemental jurisdiction over related state-law claims brought against D-BATS or other Defendants.

### 2.      Count VIII – Malicious Prosecution

Plaintiff brings a state law claim against all Defendants for malicious prosecution. However, the Complaint does not state a claim for malicious prosecution because Plaintiff does not allege that criminal proceedings were ever initiated against him. See *Seiser v. City of Chicago*, 762 F.3d 647, 659 (7th Cir. 2014) ("To prove the tort of malicious prosecution under Illinois law, [plaintiff] bears the burden of proving that (1) [defendant] initiated criminal proceedings against him; (2) those proceedings were terminated in his favor; (3) there was no probable cause to support the proceedings; (4) malice was present, *i.e.*, that the officer who initiated the proceedings was motivated by something other than a desire to bring a guilty party to justice; and (5) he suffered damages as result of the proceedings."); *Woods v. Village of Bellwood*, 502 F. Supp. 3d 1297, 1317 (N.D. Ill. 2020) (same). Rather, the Complaint alleges that "Bednarek signed complaint refusals

regarding the trespassing charge," [1] at 10, which the Court interprets to mean that Bednarek decided not to sign a complaint to pursue criminal charges against Plaintiff.

### 3.    Count IX – Civil Conspiracy

Count IX, for civil conspiracy, is based on the same allegations as the Section 1983 conspiracy claim. "In Illinois, plaintiffs may prove a civil conspiracy claim by showing: '(1) a combination of two or more persons, (2) for the purpose of accomplishing by some concerted action either an unlawful purpose or a lawful purpose by unlawful means, (3) in the furtherance of which one of the conspirators committed an overt tortious or unlawful act.'" *Inteliquent, Inc. v. Free Conferencing Corp.*, 503 F. Supp. 3d 608 (N.D. Ill. 2020) (quoting *Fritz v. Johnston*, 807 N.E.2d 461, 470 (Ill. Sup. 2004)). The Court finds the Complaint's allegations of civil conspiracy sufficient to state a claim against Bednarek, Mercado, Bartoga and Ishoo, for the same reasons explained above in relation to the Section 1983 conspiracy claim. In short, the allegations suggest that Bednarek, Mercado, Bartoga and Ishoo all knew at some point near the beginning of Plaintiff's detention that there was not probable cause for detaining Plaintiff for trespass because Bednarek had no ownership rights in the property, yet went along with Bednarek's threats to force Plaintiff to convince Halloran to return to the Property to accept the eviction notice.

### 4.    Count X – Intentional Infliction of Emotional Distress

In Count X of the Complaint, Plaintiff alleges that Defendants acted in an extreme and outrageous manner by threatening him with arrest and detaining him for two hours when they knew that there was no basis for criminally charging him. Plaintiff alleges that Defendants "intended to cause, or were in reckless disregard of the probability that their conduct would cause, severe emotional distress to Plaintiff," and that their conduct did, in fact, "directly and proximately cause severe emotional distress to Plaintiff." [1] at 22.

31

To state an IIED claim, a plaintiff must allege facts sufficient to show: (1) 'conduct [that is] truly extreme and outrageous'; (2) that the defendant 'intend[ed] that his conduct inflict severe emotional distress, or know that there [was] at least a high probability that his conduct [would] cause severe emotional distress'; and (3) that 'the conduct ... in fact cause[d] severe emotional distress.'" *Grimes v. County of Cook*, 455 F. Supp. 3d 630, 641 (N.D. Ill. 2020) (quoting *McGrath v. Fahey*, 533 N.E.2d 806, 809 (Ill. Sup. 1988)).

The County officers argue that the Complaint's allegations are insufficient because "the facts suggest an unpleasant landlord-tenant dispute occurring from disagreement as to what decedent's estate permitted regarding the subject property" and do not "plausibly suggest that [Plaintiff's] detainment was 'beyond all possible bounds of decency.'" [58] at 20; These Defendants do not discuss any case law involving facts similar to this case. Bednarek makes similar arguments and compares this case to *Turcios v. DeBruler Co.*, 32 N.E.3d 1117 (Ill. 2015), which involved an IIED claim brought by relatives of a decedent who had committed suicide after being evicted from his apartment so that it could be demolished. However, the facts in that case were so different from the instant case that the comparison is not particularly helpful in resolving the motions to dismiss. In *Turcios*, the court concluded that the decedent's suicide was not a reasonably foreseeable result of the apartment agent's conduct of breaking the lease and pressuring the decedent to leave the apartment, where, after sending a 30-day eviction notice, the apartment allegedly offered to transfer the decedent to another unit with a free month of rent, offered him a $2,000 incentive to move, and advised him in advance when demolition would begin. *Id*. at 1128. The Supreme Court concluded based on those facts that, "[a]s a matter of law, decedent's suicide was not a reasonably foreseeable result of defendant's alleged conduct in breaking the lease and pressuring the couple to vacate the apartment." *Id*. This case does not involve a suicide—which

32

"may result from a complex combination of psychological, psychiatric, chemical, emotional, and environmental factors," *id*. at 1129—and contains no allegations suggesting a willingness of Bednarek to work with Plaintiff in a cooperative manner to obtain Halloran's consent to accept service.

While it is a close call, the Court concludes that the Complaint's allegations are sufficient to survive the pleading stage. "[T]o qualify as outrageous, the nature of the defendant's conduct must be so extreme as to go beyond all possible bounds of decency and be regarded as intolerable in a civilized society." *Gross v. Chapman*, 475 F. Supp. 3d 858, 863–64 (N.D. Ill. 2020) (quotation marks and citation omitted). "'Mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities' do not amount to extreme and outrageous conduct, nor does conduct 'characterized by malice or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort.'" *Weller v. Paramedic Services of Illinois, Inc*., 297 F. Supp. 3d 836, 849–50 (N.D. Ill. 2018) (quoting *Van Stan v. Fancy Colours & Co.*, 125 F.3d 563, 567 (7th Cir. 1997)). Nonetheless, as the Illinois Supreme Court has summarized, "Illinois cases in which intentional infliction of emotional distress has been sufficiently alleged … very frequently involved a defendant who stood in a position of power or authority relative to the plaintiff." *McGrath v. Fahey*, 533 N.E.2d 806, 810 (Ill. Sup. 1988). In such circumstances, "[t]he extreme and outrageous nature of the conduct may arise not so much from what is done as from abuse by the defendant of some relation or position which gives him actual or apparent power to damage the plaintiff's interests"; "[t]he result is something very like extortion." *Id*. (quoting *Milton v. Illinois Bell Tel. Co*., 427 N.E.2d 829, 832 (Ill. App. 1981)).

This case concerns Defendants who are in a position of power relative to the Plaintiff. Bednarek allegedly held himself out as a CPD officer and Mercado, Ishoo and Bartoga were all

on-duty County police officers when the July 12, 2019 incident occurred. According to the Complaint, the officers acted together to detain Plaintiff in the back of Mercado's squad car, where Bednarek "repeatedly verbally assaulted, abused and berated [Plaintiff] and made derogatory comments to and about him." [1] at 9. The County officers allegedly stood by while these abuses occurred, going along with Bednarek's plan to force Halloran to return to the Property to accept the eviction notice, even though there was no probable cause to detain Plaintiff. The Court cannot say at this early stage of the case whether these allegations, if proven, "go beyond all possible bounds of decency" and should be "regarded as intolerable in a civilized society." *Gross*, 475 F. Supp. 3d at 863–64. Defendants do not discuss any case law involving similar facts. Further, in recent years the public has become increasingly less tolerant of abuses of police power, which may call into question the relevance of older case law. Finally, the Court finds Plaintiff's allegations that he suffered severe emotional distress to be sufficient, as evidence of the "extent of the emotional distress sustained" is "not necessary or appropriate at this stage," where "we are only evaluating the sufficiency of the pleadings." *Kolegas v. Heftel Broadcasting Corp.*, 607 N.E. 201, 213 (Ill. Sup. 1992); see also *Gvozden v. Mill Run Tours, Inc.*, 2011 WL 1118704, at *7 (N.D. Ill. Mar. 28, 2011) (denying motion to dismiss IIED claim based on allegation that defendants, who were private persons, falsely reported plaintiff's conduct to the police). For these reasons, the Court will allow Plaintiff to proceed on his IIED claims against the four individual Defendants.

### 5. Count XI – False Imprisonment

Under Illinois law, "'[t]he elements of a cause of action for false imprisonment are that the plaintiff was restrained or arrested by the defendant, and the defendant acted without reasonable grounds to believe that an offense was committed by the plaintiff.'" *Molina v. Latronico*, 430 F. Supp. 3d 420, 438 (N.D. Ill. 2019) (quoting *Poris v. Lake Holiday Property Owners Ass'n*, 983

N.E.2d 993, 1007 (Ill. Sup. 2013)).  The Court concludes that Plaintiff has stated a state-law false imprisonment claim against Bednarek, Mercado, Ishoo and Bartoga for the same reasons discussed above in relation to the Section 1983 false imprisonment claim (Count II).

### 6. Count XII – False Police Report

Count XII alleges that "Defendant Bednarek knowingly transmitted or caused to be transmitted to Defendants, Cook County and Cook County Sheriff's Police Officers a false and untrue report that the offense of trespass was being committed" even though, "[a]t the time of such transmission, Defendant Bednarek knew that there was no valid, reasonable or rational legal ground for making the report and, further, that no reasonable ground existed for the belief that such an offense had been committed."  [1] at 23.  As far as the Court can determine, "false police report" (Count XII) is not an independent, cognizable claim under Illinois law.  This count will be dismissed in full.

### 7. Count XIII - Respondeat Superior

Plaintiff brings Count XIII, a claim for *respondeat superior*, against the County and the City.  See [1] at 24.

#### a. The County

The County argues that the respondeat superior claim against it must be dismissed because "the Sheriff and his officers are not county employees and, as a result, the County cannot be held liable for the alleged conduct of the Sheriff or his employees."  [21] at 8.  The County's argument is supported by the case law and therefore the Court will dismiss Count XIII against the County. See *Moy v. County of Cook*, 640 N.E.2d 926, 930 (Ill. Sup. 1994) ("[T]he position of sheriff is an office and not a mere employment.  As such, the doctrine of *respondeat superior* has no application."); see also *Franklin v. Zaruba*, 150 F.3d 682, 685 (7th Cir. 1998) (recognizing that

"the Illinois Supreme Court … has held that counties may not be held liable under *respondeat superior* for the actions of their sheriffs even though Illinois sheriffs are county officers"); *Fells v. County of DuPage*, 2006 WL 3692414, at *2 (N.D. Ill. Dec. 2, 2006) ("a county is not liable under respondeat superior for the acts of its sheriff's office because the sheriff is an independently elected county officer rather than an employee of the county"); *O'Connor v. County of Cook*, 787 N.E.2d 185, 190 (Ill. App. 2003) (Cook County does not "bear any vicarious liability for the acts and omissions of the Sheriff and his staff").

### b. The City

The City argues that it cannot be held liable for any of the alleged violations of state law committed by Bednarek because Bednarek was not acting within the scope of his employment as a CPD officer at the time of the July 12, 2019 incident.

"Under traditional principles of *respondeat superior*, an employer may be held liable for the torts of its employee if the tort is committed within the scope of employment." *Krause v. Turnberry Country Club*, 571 F. Supp. 2d 851, 864 (N.D. Ill. 2008) (citing *Pyne v. Witmer*, 129 Ill. 2d 351 (Ill. Sup. 1989). "Under Illinois law, there are three necessary criteria for an employee's action to be within the scope of his employment. First, the relevant conduct must be of the kind that the employee was employed to perform. Second, the conduct must have occurred substantially within the time and space limits authorized by the employment. And third, the conduct must have been motivated, at least in part, by a purpose to serve the employer." *Elston v. County of Kane*, 948 F.3d 884, 887 (7th Cir. 2020) (citing *Adames v. Sheahan*, 909 N.E.2d 742, 755 (Ill. Sup. 2009); RESTATEMENT (SECOND) OF AGENCY § 228). All three criteria must be met, and thus "failure to establish any one of them is sufficient to place conduct outside the scope of employment." *Id*.

The Court finds it necessary to discuss only the third requirement, because it is dispositive and requires dismissal of Count XIII against the City. The only inference to be drawn from the facts set forth in the Complaint is that Bednarek's actions on July 12, 2019 were not motivated, either in whole or in part, by a purpose to serve CPD or the City. Rather, they were motivated solely by his desire to serve the eviction notice on Halloran, which was a task he was performing for D-BATS, a private company. The Complaint alleges that Bednarek was off duty as a CPS officer at the time of the incident. It further alleges that Plaintiff admitted to the County officers that he had no right to sign a complaint against Plaintiff for trespass, since he had no ownership interest in the Property. Bednarek told the County officers that he was just trying to "scare" and "squeeze" Plaintiff by threatening him with the possibility of arrest. And once Bednarek obtained his desired purpose—having Plaintiff convince Halloran to return to the Property—Bednarek declined to sign a criminal complaint. All of these facts taken together show that Bednarek had no intention of enforcing Illinois trespass law, but rather was motivated solely by his desire to serve the eviction notice on behalf of D-BATS. Therefore, the City is not responsible in *respondeat superior* for Bednarek's violations of Illinois law.

### 8. Count XIV – Indemnification

This claim is brought against the County and the City pursuant to the Illinois Tort Immunity Act. See [1] at 24.

### a. The County

The County "does not seek to dismiss Count XIV as it has an obligation to indemnify all County employees, including those employees of the Cook County Sheriff." [21] at 4 (citing 745 ILCS 10/2-302). Therefore, this claim will be allowed to proceed against the County.

b.      **The City**

The City argues that 745 ILCS § 10/9-102 does not require it to indemnify Bednarek for any judgment against him on the state law claims because Bednarek was not acting within the scope of his employment when he committed the acts set out in the Complaint. Because "the analysis of the scope of employment issue is essentially the same for purposes of liability under the doctrine of *respondeat superior* and indemnification under Section 10/9–102," *Lyons v. Adams*, 257 F. Supp. 2d 1125, 1138–39 (N.D. Ill. 2003), the Court concludes for the reasons set forth in the proceeding section that the City is not subject to indemnification on the state law claims and is entitled to dismissal of Count XIV.

9.      **Counts XV and XVI – Unreasonable Detention and Unlawful Detention**

In Count XV, labeled "unreasonable detention," Plaintiff alleges that the individual Defendants detained Plaintiff in the back of Mercado's squad car without any legal basis, resulting in severe emotional and physical injury and trauma to Plaintiff. See [1] at 26. Count XVI, "unlawful detention," is based on nearly identical allegations. As far as the Court can determine, these are not recognized causes of action in Illinois; rather, Plaintiff is just giving different names to his false arrest claim. Cf. *Howard v. State*, 1993 WL 13151376, at *2 (Ill. Ct. Cl. 1993) ("even when the arrest itself is perfectly valid and legally sustainable, an unreasonable detention following the arrest can be, in and of itself, 'false imprisonment'"); *Morse v. Nelson*, 363 N.E.2d 167, 170 (Ill. App. 1977) ("False imprisonment consists of an Unlawful detention, confinement or restraint."). Therefore, Counts XV and XVI will both be dismissed.

10. **Count XVII – Kidnapping**

Count XVII of the Complaint alleges that the individual Defendants engaged in "kidnapping" when Plaintiff was handcuffed and placed in the back of Mercado's squad car for nearly two hours. This claim will also be dismissed because, as far as the Court has been able to determine, kidnapping is a criminal offense under Illinois law, see 720 ILCS 5/10-1 *et seq.*, not a civil cause of action.

## IV. Conclusion

For these reasons, Defendants' motion to dismiss for want of prosecution [66] and Plaintiff's request for additional time to respond to the motions to dismiss [72] are both denied. Plaintiff's counsel is advised that any further noncompliance with applicable rules and orders may result in sanctions up to and including dismissal of this action. The County's motion to dismiss [21] is granted; the City's motion to dismiss [28] is granted in part and denied in part; Bednarek and D-Bat's motion to dismiss [49] is granted in part and denied in part; Bednarek and D-Bat's motion to strike [50] is denied; and Dart, Barloga, Abelardo and Ishoo's motion to dismiss [58] is granted in part and denied in part. The following claims are dismissed in full: Counts I, III, IV, V, VII, VIII, XII, XIII, XVI, and XVII. The following claims remain in the case against the following Defendants: Count II (Section 1983 False Imprisonment) against Bednarek only; Count VI (Section 1983 Conspiracy) against Bednarek only; Counts IX (Civil Conspiracy), X (Intentional Infliction of Emotional Distress), and XI (State Law False Imprisonment) against Bednarek, Mercado, Ishoo, and Barloga; and Count XIV (Indemnification) against the County only. A joint status report is due by August 5, 2021.

Dated: July 22, 2021

Robert M. Dow, Jr.
United States District Judge